**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| BEECHWOOD LAKELAND HOTEL, LLC, | Civil Action No. _____ |
| Plaintiff, | |
| v. | |
| U.S. BANK, National Association, as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2012-LC5, Commercial Mortgage Pass-Through Certificates, Series 2012-LC5. | |
| Defendant. | |
| | **COMPLAINT** |

Plaintiff, Beechwood Lakewood Hotel, LLC ("Borrower"), by and through its attorneys ARNOT LAW OFFICES allege the following against the Defendant:

## **INTRODUCTION**

1.      Over the past two months, economies have plummeted as a result of the economic crisis caused by the COVID-19 pandemic (the "Pandemic").  In response, federal and state governments have started, and continue to, implement measures to contain the Pandemic, including ordering in many instances all non-essential business to remain closed and requiring individuals to stay in their homes.[1]

---

[1] Borrower operates a hotel in Florida.  Florida Governor Ron DeSantis issued a revised emergency order on April 1st restricting people to their homes except for medical appointments, to care for another or to shop for groceries. Vacation travel is not considered essential. The Centers for Disease Control and Prevention and the President of the United States have issued similar advisories.

1

2.      The hotel industry has been hit particularly hard as the result of "stay at home" and other governmental orders limiting and/or precluding travel that have essentially forestalled the hotel industry from operating.  Governments, both federal and state, have and continue to require businesses to remain closed and people to stay in their homes.

3.      Borrower, a hotel operator, brings this complaint for declaratory relief. Borrower's loan is held by a Commercial Mortgage Backed Securities ("CMBS") Trust. CMBS loans are bundled into a trust, and bonds supported by the stream of interest payments from the loans are then sold to investors.  The Trusts are administered by Wells Fargo, National Association ("Wells Fargo"), who acts as the agent and master servicer of the Trust, and Rialto Capital Advisors, LLC ("Rialto"), who acts as the agent and special servicer of the Trust.

4.      On March 27, 2020, in response the Pandemic, the federal government passed the Coronavirus Aid Relief, and Economic Security ("CARES") Act thereby creating the Paycheck Protection Program ("PPP").  The PPP is a federally supported program designed to provide short-term financial assistance to small business to help soften the immediate economic impact of the Pandemic.

5.      The PPP, in part, was meant to assure that small business could survive the economic fallout of the Pandemic and continue to make payroll and other "allowable costs," including providing health benefits to employees, rent and utilities.  To the extent the PPP funds are used for allowable uses, they are fully forgivable.  The PPP was meant to provide a disincentive for business laying off their employees, as the government would be largely responsible for unemployment benefits if those employees were laid off.

6.    The Borrower's loan agreement with the Defendant prohibits the Borrower from taking on additional indebtedness.  Specifically, Section 5.22 of the Loan Agreement (defined *supra*,) provides: "Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables (A) are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of four percent (4%) of the then outstanding amount of the Principal, and (C) are paid within one hundred twenty (120) days of the date incurred (collectively, "Permitted Indebtedness")."

7.    Because the PPP funds potentially are entirely forgivable, like grants, it is unclear whether the Defendant will consider the PPP funds to be indebtedness under the Loan Agreement. In spite of numerous requests for clarification by the Borrower, the Defendant has failed to provide any response as to whether the Defendant will consider the Borrower obtaining PPP funds as additional indebtedness and thus a default under the Loan Agreement.

8.    The Borrower desires to participate in the PPP, but as a result of certain loan restrictions, including the prohibition on additional indebtedness and springing recourse guarantees, participation in the PPP may trigger onerous default provisions.  The Borrower has repeatedly asked the Defendant and its agents for its position on the Borrower's participation in the PPP and/or waivers from the additional indebtedness and springing recourse provisions.  For several weeks, the Defendant refused to respond or

offer waivers from the additional indebtedness provision, despite the fact that the PPP funds may be fully forgivable.  *See* §1106(i) of the CARES Act.

9.      Borrower seeks a declaration that (i) the prohibition against additional indebtedness contained in the Loan Documents is unenforceable as a violation of public policy in regard to the PPP funds.

10.     As a direct result of the Pandemic, Borrower has been suffering an almost complete loss of income for more than 30 days, and it is imperative for the Borrower to obtain PPP funds to prevent the closure of their businesses permanently, resulting in loss of jobs for their employees – the very societal harm the federal government is trying to avoid by enacting the PPP.

11.     The opportunistic and improper behavior of Defendant amid the most significant economic crisis in a generation – and while government efforts to restore liquidity to markets are underway – must be stopped.  Defendant's actions and inactions pose an existential threat to Borrower's very existence and risk undermining government efforts to stabilize financial markets.

## PARTIES

12.   Plaintiff Beechwood Lakeland Hotel, LLC ("Beechwood Lakeland") is a Florida limited liability company and a Special Purpose Entity ("SPE") that owns a hotel in Florida with its primary offices located at 1025 Thoroughbred Ln., De Pere, WI 54115.

13.     Defendant is U.S. Bank National Association as Trustee for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2012-LC5, Commercial Mortgage Pass-Through Certificates Series 2012-LC5.  U.S. Bank, National Association has its principal place of business located at 800 Nicollet Mall, Minneapolis, MN 55402, with

offices of its registered agent, Paula Oswald, located at U.S. Bank National Association, 633 W. 5th Street, 24th Floor, Los Angeles, CA 90071 ("U.S. Bank Trust").

## JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. § 1332 as the controversy is between citizens of different states and the potential damages for the Plaintiff if it is not granted declaratory relief are potentially tens of millions of dollars and well exceed the $75,000.00 jurisdictional threshold.

15.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391, as pursuant to the contract between the Parties, the parties have agreed that venue is appropriate "in any federal or state court in Polk County, Florida" (Exhibit 1, (Loan Agreement, p. 77, ¶ 10.6 (b).)

## FACTUAL ALLEGATIONS

16.     The Royal Bank of Scotland PLC made a loan to Beechwood Lakeland in the original principal amount of $8,125,000, pursuant to that certain Loan Agreement dated August 22, 2012 (the "Loan Agreement" Exhibit 1).  The Beechwood Lakeland loan is evidenced by that Certain Promissory Note dated August 22, 2012 (the "Beechwood Lakeland Promissory Note") executed by Beechwood Lakeland in favor of the Royal Bank of Scotland PLC, and is secured by certain real property located in Lakeland, FL.

17.     Upon information and belief, the Royal Bank of Scotland PLC subsequently transferred the Beechwood Lakeland loan, the Beechwood Lakeland Loan Agreement, and the Beechwood Lakeland Promissory Note to U.S. Bank National Association, as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage

Trust 2012-LC5, Commercial Mortgage Pass-Through Certificates Series 2012-LC5, the U.S. Bank Trust.

18.     Upon information and belief, U.S. Bank National Association, as Trustee, for the Registered Holders of Wells Fargo Commercial Mortgage Trust 2012-LC5, Commercial Mortgage Pass-Through Certificates Series 2012-LC5, the U.S. Bank Trust, is the current Holder of the Beechwood Lakeland loan, Beechwood Lakeland Loan Agreement and Beechwood Lakeland Promissory Note.

19.     The Beechwood Lakeland loan, the Loan Agreement and Beechwood Lakeland Promissory Note are serviced by Wells Fargo who acts as the agent and master servicer of the loan and Rialto who acts as the special servicer and agent for the U.S. Bank Trust.

20.     The Loan Agreement contains the following prohibition regarding additional indebtedness:

> **Indebtedness.**  Borrower shall not directly or indirectly create, incur or assume any indebtedness other than (i) the Debt and (ii) unsecured trade payables incurred in the ordinary course of business relating to the ownership and operation of the Property, which in the case of such unsecured trade payables are not evidenced by a note, (B) do not exceed, at any time, a maximum aggregate amount of four percent (4%) of the loan then outstanding amount of the Principal and (C) are paid within one hundred twenty (120) days of the date incurred (collectively, "***Permitted Indebtedness***")(Loan Agreement § 5.22).

21.     The Loan Agreement contains an exculpation/non-recourse clause which reads in part:  "Lender shall not enforce the liability and obligation of Borrower to

perform and observe the obligations contained in the Loan Documents by any action or proceeding where a money judgment shall be sought against the Borrower . . . except as specifically provided herein, any judgment in any such action or proceeding shall be enforceable against the Borrower only to the extent of Borrower's interest in the Property, the Rents or any other collateral given to Lender, and Lender shall not sue for, seek or demand any deficiency judgment against Borrower in any such action or proceeding under or by reason of or under or in connection with any Loan Document." (Loan Agreement, § 10.1)

22.    The Loan Agreement further provides:  "(B) Lender's agreement not to pursue personal liability of Borrower as set forth above SHALL BECOME NULL AND VOID and shall be of no further force and effect, and the Debt shall be fully recourse to Borrower in the event that one or more of the following occurs (each a ***"Springing Recourse Event"):***

**(ii)  . . . . a breach of the covenants set forth in Section 5.13 hereof".** (Loan Agreement, § 10.1(ii))

23.    Section 5.13 of the Loan Agreements reads:

"**Special Purpose Entity.**   Borrower shall at all times be a Special Purpose Entity.  Borrower shall not make any change or amendment or modification to its organizational documents, or otherwise take any action which could result in Borrower not being a Special Purpose Entity.  A ***"Special Purpose Entity"*** shall have the meaning set forth on Schedule 5 hereto."

24.    Schedule 5, (xxi) states, "(a) if any such entity owns the Property, had not and will not have any indebtedness other than Permitted Indebtedness."

25.     Borrower wishes to avoid any declaration of default or declaration that a Springing Recourse Event has occurred because it accessed PPP funds to keep its business above water while continuing to pay its employees, consistent with the federal government's purpose in passing the CARES Act.

**LENDER'S FAILURE TO CONSIDER FORBEARANCE OR PROVIDE ANY RESPONSE IN REGARD TO BORROWER'S ANTICIPATED PARTICIPATION IN THE PPP.**

26.     On March 19, 2020, Borrower's counsel communicated with Wells Fargo, Master Servicer, seeking short term assistance as a result of the Pandemic, including relief from principal payments, interest payments and Fixture, Furniture and Equipment reserves to allow the Borrower to weather the storm until full operations could be restored.

27.     Receiving no response, Borrower again communicated with Wells Fargo on March 20, 2020.  Borrower finally received a response on March 23, 2020, which stated: "Wells Fargo is the master servicer of the CMBS trust which owns your loan.  In the capacity, Wells Fargo has no authority to provide any immediate relief, waiver or forbearance to the monetary terms of your loan.  As this is a rapidly evolving situation, be aware that we are in ongoing communications with the trust's named special servicer (Rialto Capital) as to the best way to manage potential borrower issues related to COVID-19.  The special servicer is the entity that has been hired by the bondholders to make material decisions regarding your loan."  As opposed to providing contact information for those at Rialto who could make material decisions regarding the Loan Agreements, Wells Fargo requested substantial information from the Borrower.

28.     Shortly thereafter on March 23, 2020, less than one hour after receiving Wells Fargo's belated response, Borrower responded by informing Wells Fargo that the information requested would be assembled as quickly as possible.  Borrower also asked Wells Fargo: "Will you then forward our request to Rialto or should we contact someone there?  The federal government is ordering lenders to offer homeowners reduced or suspended mortgage payments for up to 12 months.  Similarly, NY state is ordering financial institutions to waive mortgage payments for 90 days.  Others are implementing similar programs.  Could you share what reforms Wells Fargo and Rialto are discussing to help borrowers, and the overall economy, survive the crisis?"

29.     On March 24, 2020, less than twenty-four hours after the initial request, Borrower provided Wells Fargo with virtually all of the information that had been requested, with the exception of information contained on Hilton's Revenue Management System which was, at that time, experiencing technical difficulties.  Borrower also asked Wells Fargo the following: "The federal government and multiple states have started providing disaster relief to small businesses in the form of grants or loans.  Could you or Rialto confirm that Borrowers can apply for disaster relief loans without triggering a default under the existing loans?"

30.     On March 24, 2020, Wells Fargo responded that it was forwarding the Borrower's request and information to Rialto, the special servicer.

31.     On March 29, 2020, after receiving no response from Wells Fargo or Rialto, Borrower again communicated with Wells Fargo and asked: "I was wondering if these [Borrowers] could apply for SBA/CARES Act loans through Wells Fargo, since it is an SBA lender.  I would think that the existing relationship with the bank would help

the process go more quickly and smoothly.  Please let us know.  As the SBA is expected to begin accepting loan applications under the CARES act within a couple of days, we are trying to gather and prepare all the required materials as quickly as possible.  As you know, timing especially important since any delay means the funding for these relief loans could be quickly exhausted.  Unfortunately, these borrowers still need confirmation that they can take on this debt without triggering a default on the existing loans . . . we have not heard from Rialto regarding this matter.  I would appreciate if you would follow up with them.  I understand that they are overwhelmed at the moment, but with so many hotels in desperate need of this relief, it would be inconceivable for them to stand in the way."

32.     After receiving no response, Borrower followed up with Wells Fargo on March 30, 2020, and again asked, "I'm sure you are very busy at the moment.  However, we would much appreciate if you could at least let us know whether these debtors could apply for the SBA Paycheck Protection Loans through Wells Fargo – and who we could speak with about preparing our applications."

33.     On March 30, 2020, Wells Fargo responded stating: (a) "Regarding SBA loans, I am not authorized to advise you on how to proceed, but generally most loan document will not allow the SPE borrower to incur additional debt;" (b) "I have not heard anything from Rialto;" and (c) "In general, a special servicer cannot modify the timing or amount of your principal and interest payments unless the servicing of the loan is formally transferred from the master servicer to the special servicer (i.e. the loan becomes a 'specially serviced loan').  When a loan is transferred to the special servicer, the special servicer will have full authority over all decisions to be made with respect to the loan and

the borrower will no longer have direct communications with Wells Fargo.  As the Special Servicer is a third party, Wells Fargo cannot opine or advise you as to what action the special servicer may or may not ultimately take with respect to your loan.  In addition, we encourage you to review your loan documents as many loan documents obligate the borrower to pay all special servicing fees."

34.     On March 30, 2020, Borrower reached out directly to Rialto, the special servicer and stated:  "It has been 10 days since I reached out to Wells Fargo for relief for the above borrowers and at least 6 days since David Potier forwarded the request and accompanying information to you.  We have still heard nothing from Rialto about this request.  Please direct me to someone who can assist ASAP.  I know you are overwhelmed right now.  So are we.  My clients are trying to keep their businesses alive.  And you are making it much harder.  **All we need at the moment is consent for these borrowers to accept the disaster relief that the government is offering in the form of SBA Paycheck Protection loans.**  Do you have any policy in place for allowing borrowers to obtain these unsecured, non-recourse, unguaranteed loans, which are subject to forgiveness, that the government is giving away as disaster relief?  Are you really going to prevent CMBS borrowers from accepting disaster relief?  These hotels need to apply for SBA Paycheck Protection loans immediately once they become available.  What documents do you need to review and process this request?  We will send them.  Please can we get this started now."  (Emphasis in original).

35.     On April 1, 2020, Borrower reached out to Rialto through counsel that was representing Rialto on an unrelated issue relating to a different property and stated:  "Please note that this Borrower and three related borrowers have now been waiting for

over a week to hear from your client.  We have received no response, or acknowledgement, regarding their request for a 90-day payment deferral and some assurance that they do not intend to call a default for borrowers' obtaining disaster relief through the Paycheck Protection Program.  The written assurance is needed most urgently.  The borrowers need to submit applications early Friday morning to ensure they are processed before program funding runs out."

36.    On April 1, 2020, Rialto's counsel responded: "With regards to your request, I have forwarded your email to Rialto.  Please note that while I have forwarded your email to Rialto for review, the Borrower must contact the Master Servicer [Wells Fargo] for these requests per the Loan Documents."  Borrower responded: "Thank you Christina.  The Master Servicer told me that he passed on this request to Rialto over a week ago."

37.    On April 9, 2020, after receiving no response from Rialto or Wells Fargo, Borrower again wrote directly to Rialto explaining: "[T]he requested relief is urgently needed and vital to the borrowers listed above.  Please be aware the Master Servicer (Wells Fargo) provided our requests to Rialto over two weeks ago.  Since then, we have not received any communication from Rialto, not even acknowledgement of receipt or any response to our follow-up email.  While I understand that providing formal consent takes time, we would expect to at least receive some informal guidance and updates on the status of our requests – at the very least some acknowledgment that our request was received."

38.    On April 16, 2020, three weeks after the initial request, Wells Fargo -- not Rialto -- responded to Borrower's April 9 request and stated: "Subsequent to your email

below to Rialto, Rialto has now asked that Wells Fargo as master servicer transfer the loan to special servicing.  Rialto cannot evaluate your payment relief request further unless the loan become special serviced.  The purpose of this email is (1) to make you aware that a transfer to special servicing is about to occur and (2) to inquire as to whether you have any other means to make May payment absent transfer."

39.     On April 16, bewildered by the conduct and complete refusal to have any substantive conversations by both the Wells Fargo and Rialto, Borrower responded: "We do not want the loans transferred to special servicing if it means saddling the borrower with additional servicing fees.  You are saying that no one can even consider a request for payment relief until the loans are transferred to special servicing?  So the borrowers can't even get an answer regarding payment relief without become liable for additional servicing fees for the duration of the loan?  In normal times, this could be considered extortionist.  Under the current circumstances, it's reprehensible.  The loan agreement indicates that borrowers are liable for servicing fees 'from and after a transfer of the Loan to any special servicer following an Event of Default.'  But no default of Event of Default has occurred.  Special servicing is not needed, and the borrowers do not agree to pay any additional fees for it.  We have merely asked the question – can you provide borrowers any of the requested relief?  And the servicers have thus far refused to provide answers.  We still have received no response at all regarding the non-payment relief that we requested weeks ago – namely, consent to participate in the Paycheck Protection Program, which is already out of funding, and consent to temporarily cease operations, if necessary.  Regarding point 2, yes the borrowers should be able to make their May payments absent payment relief.  Does that make them ineligible for payment relief?"

40.     Subsequent to April 16, 2020, Borrower conducted further conversations with Rialto, but has received no substantive response regarding consent to the Borrower participating in the PPP or whether the Defendant will consider such participation as a default.

### THE COVID-19 CRISIS

41.     Over the past two months, the impact of the Pandemic on the economy has wreaked havoc on the equity markets.  Furthermore, amidst market participant concerns regarding liquidity, the debt markets have also become volatile, and prices declined significantly.   The debt market decline, however, did not reflect a decline in the fundamental value of the debt securities as opposed to the absence of liquidity in the marketplace.  This volatility has hit the CMBS markets particularly hard.

42.     At all levels of government, banking authorities have made clear that their overriding concern is that market participants such as Defendant do not transform the current temporary disruption in credit markets into a full-blown credit crisis.   The CARES Act is the first attempt by the federal government to rescue the economy during this crisis.

43.     With respect to the market for mortgage related securities, like CMBS loans, the Federal Reserve has taken urgent action to support market value and return market liquidity, while state and federal regulators have urged banks to desist from foreclosing on their clients' assets.  It would be short-sighted in the extreme and contrary to public policy for lenders such as Defendant to use the Pandemic as a pretext to find Borrower in technical default of its Loan Agreement – especially when Borrower has not missed a single payment – or worse, declare Borrower in default, accelerate the full

outstanding balance to become due, seize Borrower's assets and liquidate them (or allow their special servicer to purchase them) at distressed prices, all while the government is furiously working to prevent such destabilizing actions.

44.     On March 22, 2020, the Federal Reserve, in concert with the Office of the Comptroller of the Currency and the other federal banking agencies, issued an "Interagency Statement on Loan Modification and Reporting for Financial Institutions Working with Customers Affected by the Coronavirus," which recognizes the "temporary" nature of the business disruptions and challenges posed by the national emergency and urges "financial institutions to work prudently with borrowers who are or may be unable to meet their contractual payment obligations because of the effects of COVID-19." The Statement adds that "[t]he agencies view loan modification programs as positive actions that can mitigate adverse effects on borrowers due to COVID-19" and serve "the best interest of institutions, their borrowers, and the economy."[2]

45.     On March 23, 2020, the Federal Reserve announced that it would include CMBS among the $200 billion in agency backed mortgage-backed securities it plans to purchase as part of its efforts to support smooth market functioning.[3]

46.     On April 7, 2020, the Federal Reserve revised its March 22, 2009 Interagency Statement advising that "[t]he agencies will not criticize institutions for working with borrowers in a safe and sound manner" and that "[f]inancial institutions have broad discretion to implement prudent modification programs consistent with the framework included in this statement." In fact, the revised statement relaxes financial

[2] Available at https://www.fdic.gov/news/news/press/2020/pr20038a.pdf.

[3] https://federalreserve.gov/newsevents/pressreleases/monetary20200323a.htm.

institutions' accounting policies for a limited time to account for the effects of COVID-19, specifically related to troubled debt restructuring ("TDR").[4]

47.     The Federal Reserve's interventions all recognize that the challenge facing the markets is to bridge the disruptions caused by the COVID-19 pandemic and maintain the flow of capital to – not away from – borrowers such as Plaintiffs.

48.     Florida has followed the lead and policy of the federal government by enacting the Florida Small Business Emergency Bridge Loan Program which, "will provide short-term, interest free loans to small businesses that experienced economic injury from COVID-19."   "These loans are interest-free for up to one year and are designed to bridge the gap to either federal SBA loans or commercially available loans."[5]

49.     Governor Ron DeSantis's Executive Order No. 20-95, dated April 3, 2020 stated, "I find that encouraging small business in Florida to apply for these loans is in the best interest of the state and its people."

50.     The federal banking agencies have made clear to lenders, that they must work cooperatively with clients affected by the Pandemic and that it is the national interest and the interest of the State of Florida. As authorities marshal their resources to prevent banks from foreclosing on their customers and to provide liquidity to the market,

---

[4]   Available   at   https://www.federalreserve.gov/newsevents/pressreleases/files/bcreg20200407a1.pdf. Specifically, the Federal Reserve advises that "working with borrowers who are current on existing loans, either individually or as part of a program for creditworthy borrowers who are experiencing short-term financial or operational problems as a result of COVID-19 generally would not be considered TDRs. More specifically, financial institutions may presume that borrowers are not experiencing financial difficulties at the time of the modification for purposes of determining TDR status, and thus no further TDR analysis is required for each loan modification in the program, if: The modification is in response to the National Emergency; The borrower was current on payments at the time the modification program is implemented; and • The modification is short-term (e.g., six months).

[5]
https://www.dms.myflorida.com/agency_administration/office_of_supplier_diversity_osd/covid_19_small_business_resources

the only commercially reasonable course of action is to forebear from triggering a vicious cycle of forced liquidations and depressed market values. Defendant's inactions in the face of Borrower's numerous attempts to determine whether participation in the PPP would trigger default provisions in the Loan Agreement are an attempt to capitalize on the Pandemic and force Borrower into an untenable position of deciding whether to keep their businesses afloat or face technical defaults and springing guarantees, by accessing the PPP funds.

51.     By its express terms, the Loan Agreement is to be governed and construed in accordance with Florida law.

52.     Defendant has refused provide any insight as to whether they will deem Borrower's participation in the PPP program a default under the Loan Agreement despite the federal mandates providing that lenders are to work with borrowers in a prudent and reasonable manner.

53.     The public policy set forth by both the Federal Reserve and the State of Florida make clear that Borrower should not be penalized for seeking aid through the PPP program.

**<u>FIRST CLAIM FOR RELIEF – DECLARATORY JUDGMENT</u>**

54.     Plaintiffs repeat, reiterate, and allege each and every allegation of paragraphs 1 through 53 of this Complaint as is fully set forth herein.

55.     Borrower has entered into a Loan Agreement with the Defendant which contain provisions that Defendant will likely claim prevent Borrower from accessing and participating in the PPP program (i.e., the additional indebtedness provisions).

56.     The PPP was designed and implemented by the federal government to combat the economic disaster caused the Pandemic, keep markets liquid, keep business for going bankrupt and keeping millions of Americans employed, while keeping those same Americans off the unemployment rolls.

57.     To further those goals, the federal government created the PPP, to provide funds to flow directly to American small business, while at the same time making those funds fully forgivable and relieving the obligation of any participant in the PPP to repay the funds if certain guidelines are followed.

58.     The federal government has clear made their policy clear that they expect lenders to work with borrowers suffering the results of the Pandemic and the federal government has allocated a significant amount of funds to assist in that effort.

59.     Florida's Governor has determined that it is the best interest of Florida and its people to apply for the PPP funds.

60.     Borrower has an existing and credible concern that the prohibition on additional indebtedness in the Loan Agreement may be applied by Defendant to prohibit the Borrower from participating in the PPP to stay afloat and keep hundreds of individuals employed.  Such an interpretation is in direct violation of clearly stated public policy.

61.     An actual controversy has arisen between the parties as to whether the additional indebtedness prohibitions in the Loan Agreement violates public policy as applied to the Borrower's participation in the PPP.

62.     By virtue of the public policy, Borrower is entitled to a judgment pursuant to 28 U.S.C. § 2201 declaring the prohibitions contained in the Loan Agreement

prohibiting additional indebtedness, are null and void as against public policy as it relates the PPP.

63.     Declaratory relief would serve a useful purpose in clarifying and settling the legal relations in issue and would terminate and afford relief from uncertainty, insecurity and controversy giving rise to the instant proceedings.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands and prays the Court grant relief, as follows:

a. A determination and declaration that the prohibitions contained in the Loan Agreement prohibiting additional indebtedness, are null and void as against public policy as it relates the PPP.

b. Awarding the Plaintiff its costs, attorneys' fees, and such other and further relief as this Court shall deem just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL COUNTS AND ON ANY AND ALL DEFENSES**.**

Dated May 1, 2020.

*/s/ Mark Arnot*
Mark Arnot
Florida Bar No.: 68147
Arnot Law Offices
1025 Thoroughbred Lane
De Pere, WI 54115
Telephone: (920) 347-1969
Fax: (920) 347-1970
E-mail: mark@arnotlaw.com